2005 WY 19

C.E. CARLSON and Iris M. Carlson, Trustees of the Carlson Family 1982 Trust; Michael H. Samuels; William Samuels; Babit Limited Partnership; Estate of Frank L. Shogrin, by and through Gay Woodhouse, Personal Representative; James D. Medema and Millie M. Medema, Trustees of the Medema Family Trust; Edna Mae Walker, Trustee of the Edna Mae Walker Revocable Trust; Valorie Walker, Trustee of the Jack V. Walker Revocable Trust; Peter T. Balog; and Lowell A. Rasmussen, Appellants (Plaintiffs),

v.

FLOCCHINI INVESTMENTS, a California Partnership; The Bud and Mary Lou Flocchini Family Partnership, a California Partnership; Bud Flocchini; Mary Lou Flocchini; The Richard J. and Partricia Flocchini Family Partnership, a California Partnership; Richard J. Flocchini; Patricia Flocchini; The Armando and Lena Flocchini Family Partnership; Lena Flocchini; Armando J. Flocchini, Jr., a/k/a A.J. Flocchini, Jr.; and Durham Ranches, Inc., a Wyoming Corporation, Appellees (Defendants).

No. 04–49.

Supreme Court of Wyoming.

Feb. 15, 2005.

Representing Appellants: Drake D. Hill and Timothy M. Stubson of Brown, Drew & Massey, LLP, Casper, Wyoming.

Representing Appellees: Thomas Klepperich and David Smith of Lonabaugh & Riggs, Sheridan, Wyoming.

Before HILL, C.J., and GOLDEN, KITE, and VOIGT, JJ., and YOUNG, D.J.

KITE, Justice.

[¶ 1] In this coalbed methane royalty dispute, the royalty owners[1] filed an action against the mineral owners[2] claiming they

---

1. C.E. Carlson and Iris M. Carlson, Trustees of the Carlson Family 1982 Trust; Michael H. Samuels; William Samuels; Babit Limited Partnership; Estate of Frank L. Shogrin, by and through Gay Woodhouse, Personal Representative; James D. Medema and Millie M. Medema, Trustees of the Medema Family Trust; Edna Mae Walker, Trustee of the Edna Mae Walker Revocable Trust; Valorie Walker, Trustee of the Jack V. Walker Revocable Trust; Peter T. Balog; and Lowell A. Rasmussen.

2. Flocchini Investments, a California Partnership; the Bud and Mary Lou Flocchini Family Partnership, a California Partnership; Bud Flocchini; Mary Lou Flocchini; the Richard J. and Patricia Flocchini Family Partnership, a California Partnership; Richard J. Flocchini; Patricia Flocchini; the Armando and Lena Flocchini Family Partnership; Lena Flocchini; Armando J. Flocchini, Jr., a/k/a A.J. Flocchini, Jr.; and Durham Ranches, Inc., a Wyoming Corporation.

were entitled pursuant to a mineral lease executed by the parties' successors in interest to a share of an overriding royalty interest in minerals produced from certain ranch lands. Prior to trial, the district court granted summary judgment for mineral owners on royalty owners' breach of contract claim. The royalty owners' claims for breach of fiduciary duty and breach of the covenant of good faith and fair dealing proceeded to trial. After trial, the district court entered judgment for the mineral owners. Royalty owners appealed. We affirm.

## ISSUES

■ Royalty owners present the following issues:

1. The district court erred in dismissing breach of contract claims against Flocchini Investments and its predecessors in interest when the undisputed evidence demonstrated that Flocchini Investments was the successor in interest to the initial signatories and where Flocchini Investments failed to share all royalties obtained on production in contravention of its contractual duties.

2. The district court's decision on Appellants' claim for breach of fiduciary duty erred by applying the wrong standard.

3. The district court erred in dismissing Appellants' claims for tort[i]ous interference given contested issues of fact surround[ing] Appellees' actions as they related to the contractual duty to pay a portion of all royalties to Appellants.

4. The court applied the erroneous standard for awarding damages where the Appellees were required to share all royalties obtained on the subject minerals.

Mineral owners restate the issues as follows:

A. Did the trial court err in dismissing Appellants' breach of contract claim against Flocchini Investments?

B. Did the trial court err in determining that A.J. ("Bud") Flocchini, Jr. did not breach any duty he owed to the Appellants?

C. Did the trial court err dismissing Appellants' claims for tortious interference against business expectancy?

D. Were the trial court's findings and conclusions in relation to damages correct?

## FACTS

■ In 1957, Robert and Velma Wright owned the surface estate of a large ranch in Campbell County, Wyoming. Mr. Wright's sister, Alice Spielman, owned some of the minerals underlying the ranch. In May of 1957, Ms. Spielman and the Wrights entered into a "Cross Conveyance and Stipulation of Interests" concerning the minerals underlying the ranch. Pursuant to the stipulation, Mr. Wright acquired all of Ms. Spielman's interest in the minerals, including the executive right to lease the minerals, and Ms. Spielman retained a nonparticipating royalty interest in the minerals.

■ Between 1957 and 1979, Mr. Wright conveyed his interest in the ranch and minerals to the mineral owners and Ms. Spielman conveyed her royalty interest to the royalty owners. In 1981, the royalty owners filed suit against the mineral owners, claiming they diverted royalty payments to themselves rather than sharing those payments with the royalty owners as required by the cross conveyance and stipulation. The suit was settled when the parties reached an agreement, effective November 15, 1982, providing that the term "landowner's royalty" as used in the cross conveyance included all royalties acquired by the mineral owners for oil, gas and minerals produced from the subject ranch land, including overriding royalties, and in essence that, in exchange for dismissal of the suit, the mineral owners would divide royalty payments among the parties as intended by the cross conveyance. The settlement agreement also provided:

The mineral owners shall negotiate all future oil and gas leases and other mineral leases in good faith and as ordinary prudent mineral owners.... Except as specifically hereinafter provided, should the Mineral Owners acquire an overriding royalty in the Subject Lands, the same shall be

considered to be part of the "landowner's royalty."

In 1994, interest began to grow in the production of methane gas from the ranch. At that time, Durham Ranches, Inc.,[3] owned a portion of the surface estate of the ranch, the mineral owners owned a portion of the mineral interest previously owned by Mr. Wright, and the royalty owners owned the non-participating royalty interest previously owned by Ms. Spielman. The mineral owners were interested in investigating the possibilities of coalbed methane development while Durham Ranches was concerned with the effects such development would have on the ranch. Mr. Flocchini was charged with negotiating mineral leases on behalf of the mineral owners and surface use agreements on behalf of Durham Ranches. Petrox Resources, Inc. approached Mr. Flocchini concerning the production of methane gas from beneath the ranch. Mr. Flocchini and Petrox negotiated an agreement whereby the mineral owners agreed to lease the minerals to Petrox in exchange for a 15% royalty interest and Petrox agreed to compensate Durham Ranches for surface use and damages by making a lump sum payment of $50,000, a producing well payment of $1,000 per well and a 3% overriding royalty interest in all minerals under the ranch. On the basis of this agreement, the mineral owners and Petrox executed a mineral lease on August 3, 1994, providing for payment of the 15% royalty interest. By separate letter agreement, Petrox and Durham Ranches set forth the terms for surface damage compensation, including the 3% overriding royalty interest Petrox agreed to pay to Durham Ranches.

On August 24, 2001, after learning of the letter agreement, the royalty owners filed suit against the mineral owners, alleging they had entered into an agreement having the effect of diverting to themselves royalty payments owed to the royalty owners. Royalty owners claimed Durham Ranches was an alter ego for the mineral owners and by virtue of the letter agreement providing for payment of the 3% overriding royalty interest to Durham Ranches, the mineral owners acquired royalties that the 1982 settlement agreement required to be shared with the royalty owners. Specifically, royalty owners claimed they received only their proportionate share of the 15% landowner's royalty interest when they also should have received their proportionate share of the 3% overriding royalty interest paid to the mineral owners alter ego, Durham Ranches. Royalty owners alleged claims for breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, conversion, tort[i]ous interference, constructive fraud and fraud, alter ego liability, civil conspiracy, and attorneys fees and costs.

On October 29, 2002, mineral owners filed motions seeking summary judgment on all claims. Royalty owners also filed a motion for summary judgment. The district court conducted a hearing and, on February 21, 2003, issued a decision letter in which it held that summary judgment was appropriate for mineral owners on all claims except the claims against Mr. Flocchini for breach of fiduciary duty and breach of the covenant of good faith and fair dealing.

Royalty owners filed a motion for reconsideration and clarification. Following a hearing, the trial court denied the motion as part of its order on summary judgment, which it issued the first day of trial. The parties tried the breach of fiduciary duty and breach of the implied covenant claims to the court in a three and one-half day bench trial beginning October 20, 2003. On February 3, 2004, the trial court entered an order finding generally in favor of Mr. Flocchini. Royalty owners timely appealed.

## STANDARD OF REVIEW

Royalty owners seek review of the district court's order granting sum-

---

3. A.J. Flocchini, Jr., was the president of Durham Ranches, Inc., a "separate, distinct, duly formed, and validly existing corporation." According to Mr. Flocchini, Armand Agra, Inc., a Nevada corporation, owned all of the Durham Ranches stock, and none of the individual Flocchinis or Flocchini family partnerships named as defendants owned any interest in, or received any payment from, Durham Ranches or Armand Agra, Inc. According to Mr. Flocchini, only two of Armand Agra's seven shareholders are parties or successors to parties to the 1982 settlement agreement (Mr. Flocchini and his brother, Richard).

mary judgment on the breach of contract claim and its findings of facts and conclusions of law following trial on the breach of fiduciary duty and implied covenant claims. Our standards for reviewing summary judgment orders are well established:

> ... we have the same duty, review the same materials, and follow the same standards as the district court. The propriety of granting a motion for summary judgment depends upon the correctness of a court's dual findings that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law. A genuine issue of material fact exists when a disputed fact, if proven, would have the effect of establishing or refuting an essential element of an asserted cause of action or defense.

> We view the record from the standpoint most favorable to the party opposing the motion, giving to that party all favorable inferences that fairly may be drawn from the record. We will uphold summary judgment on the basis of any proper legal theory appearing in the record. We review a grant of summary judgment deciding a question of law de novo and afford no deference to the district court's ruling.

*Merrill v. Jansma,* 2004 WY 26, ¶¶ 6–7, 86 P.3d 270, ¶¶ 6–7 (Wyo.2004) (citations omitted).

■■ Our review of a district court's findings of fact and conclusions of law is governed by the following standards:

> We review the trial court's conclusions of law *de novo.* The trial court's findings of fact are subject to the clearly erroneous standard:

>> The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there

is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

> Also, in reviewing a trial court's findings of fact,

>> we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law.

> We affirm the trial court's findings if there is any evidence to support them.

*Life Care Centers of America, Inc. v. Dexter,* 2003 WY 38, ¶ 7, 65 P.3d 385, ¶ 7 (Wyo.2003) (citations omitted).

## DISCUSSION

### 1. Breach of Contract

■ The royalty owners claim the district court erred in granting summary judgment for the mineral owners on the breach of contract claim. Specifically, they claim Mr. Flocchini negotiated the mineral lease with Petrox so as to divert a portion of the royalties to Durham Ranches rather than sharing all royalties proportionately with the royalty owners as required by the 1982 settlement agreement. They assert the district court dismissed the claim on the sole basis that Durham Ranches was not a party to the agreement without ever addressing the real breach of contract issue, i.e., the mineral owners' liability under the 1982 settlement agreement. They agree that Durham Ranches was not a party to the 1982 agreement but contend that does not resolve the issue of whether the mineral owners, who were bound by the agreement as successors in interest to Mr. Wright's mineral interests, were in breach. They contend the agreement clearly and unambiguously obligated the mineral owners to share with the royalty owners *all royalties* paid on the oil, gas and minerals produced from the ranch lands and that by entering into a lease with Petrox that paid them more and the royalty owners less,

the mineral owners violated the agreement. Specifically, the royalty owners assert Petrox initially offered to pay a royalty of 16 or 16–2/3%, meaning they would have received a higher proportionate payment. However, Mr. Flocchini countered with an offer resulting in a lower royalty payment to them and a separate royalty payment to Durham Ranches. As a result of these negotiations, royalty owners allege they obtained only a proportionate share of the 15% landowners' royalty and Mr. Flocchini's company received a 3% overriding royalty interest. They claim the 3% overriding royalty interest was not disclosed to or shared with the royalty owners and that violated the 1982 settlement agreement.

The mineral owners assert the district court properly dismissed the breach of contract claim against both Durham Ranches and the mineral owners, the former because Durham Ranches was not a party to the 1982 settlement agreement and the latter because the mineral owners did not acquire an overriding royalty interest that they refused to share in violation of the agreement. The mineral owners assert that Durham Ranches, not the mineral owners, acquired the 3% overriding royalty interest. Quoting the 1982 settlement agreement, they contend royalty interests acquired by others, who are not party to the settlement agreement, are not royalties "reserved to or acquired by mineral owners" as the agreement provides. Therefore, they argue, the mineral owners did not breach the 1982 settlement agreement.

Of the various mineral owners named as defendants in royalty owners' complaint, only three, A.R. Flocchini, Sr., A.R. Flocchini, Jr. and Richard J. Flocchini, were actual parties to the 1982 settlement agreement. Flocchini Investments, the Bud and Mary Lou Flocchini Family Partnership and the Richard J. and Patricia Flocchini Family Partnership were successors in interest to parties to the agreement so they also were bound by the agreement. The remaining parties named as defendants, including Durham Ranches, were not parties to the settlement agreement. Because a breach of contract claim lies only against contracting parties, the royalty owners stated a valid claim for breach of contract only against the mineral owners who were parties to the 1982 settlement agreement or successors in interest to those parties. The breach of contract claim did not apply to the other mineral owners named as defendants. Thus, the district court properly granted summary judgment to all those defendants not a party to the 1982 settlement agreement, including Durham Ranches.[4]

[¶ 14] The royalty owners correctly assert that the district court held only that Durham Ranches did not breach the 1982 settlement. The district court did not address the validity of the breach of contract claim against the other mineral owners named as defendants who were parties or successors to parties to the 1982 agreement. Therefore, the royalty owners asked the district court for reconsideration of its ruling. Both parties again thoroughly briefed the issue. Royalty owners reiterated their argument that mineral owners breached the 1982 agreement by acquiring a royalty interest and not sharing it with them; mineral owners claimed the only named defendant to acquire a royalty interest was Durham Ranches, which was not a party to the 1982 agreement. The district court summarily denied the motion for reconsideration without explanation in its summary judgment order. The question for our consideration, therefore, is whether the district court properly granted summary judgment on the contract claim given that it addressed the claim only in the context of Durham Ranches and not as to the mineral owners who where bound by the 1982 agreement.

In resolving that question, our inquiry focuses on whether the evidence, viewed in the light most favorable to the royalty owners, demonstrated a genuine issue of material fact as to whether the min-

4. In the district court, the royalty owners claimed Durham Ranches and Flocchini Investments were merely alter egos of the individual mineral owners and were therefore bound by the 1982 settlement agreement. They do not address that claim in their argument to this Court. Therefore, we also do not address it.

eral owners who were parties to the 1982 settlement agreement breached the agreement, or whether they were entitled to judgment as a matter of law on the breach of contract claim. We hold the district court properly granted summary judgment as to the royalty owners' claim because the terms of the 1982 agreement clearly and unambiguously provided the royalties to be shared were those "acquired" by the mineral owners, and the evidence was undisputed that the only party to acquire the 3% royalty interest was Durham Ranches, which was not a mineral owner.

... [W]hen the terms of [a contract] are unambiguous, the interpretation is a question of law.... Whether a contract is ambiguous is a question of law for the reviewing court. We review questions of law *de novo* without affording deference to the decision of the district court.

According to our established standards for interpretation of contracts, the words used in the contract are afforded the plain meaning that a reasonable person would give to them. When the provisions in the contract are clear and unambiguous, the court looks only to the "four corners" of the document in arriving at the intent of the parties. In the absence of any ambiguity, the contract will be enforced according to its terms because no construction is appropriate.

...

Our primary focus in construing or interpreting a contract is to determine the parties' intent, and our initial inquiry centers on whether the language of the contract is clear and unambiguous. If the language of the contract is clear and unambiguous, then we secure the parties' intent from the words of the agreement as they are expressed within the four corners of the contract. Common sense and good faith are leading precepts of contract construction, and the interpretation and construction of contracts is a matter of law for the courts. We have also recognized that the language of a contract is to be construed within the context in which it was written, and the court may look to the surrounding circumstances, the subject matter, and the purpose of the contract to ascertain the intent of the parties at the time the agreement was made.

*Wadi Petroleum, Inc. v. Ultra Resources,* 2003 WY 41, ¶¶ 10–11, 65 P.3d 703, ¶¶ 10–11 (Wyo.2003) (citations omitted). In interpreting unambiguous contracts involving mineral interests, we look to surrounding circumstances, facts showing the relationship of the parties, the subject matter of the contract, and the apparent purpose of making the contract. *Id.*

The 1982 settlement agreement provided in pertinent part as follows:

1. Mineral Owners hereby expressly accept, approve, confirm and ratify that the term "landowner's royalty", as used in the Cross Conveyance, shall include all royalties paid upon the oil, gas and minerals produced, saved and marketed from the Subject Lands including all overriding royalties, production payments and other cost free interests based upon or measured by the production of hydrocarbons or other minerals which have been or are hereafter reserved to or acquired by Mineral Owners, except as hereinafter specifically provided.

The agreement later reiterates:

7.... should the Mineral Owners acquire any overriding royalty in the Subject Lands, the same shall be considered to be part of the "landowner's royalty".

The evidence presented was undisputed that the only entities that "acquired" a royalty interest in mineral production from the ranch lands were the mineral owners and Durham Ranches. The mineral owners received a 15% landowners' royalty interest. Durham Ranches received a 3% overriding royalty interest along with other payments for surface damage done to the property from coalbed methane production. The royalty owners received their proportionate share of the 15% landowners' royalty interest acquired by the mineral owners under the terms of the mineral lease. What they did not receive a share of was the 3% overriding royalty interest described in the letter agreement. However, Durham Ranches, not the mineral owners, acquired that royalty. Thus,

it was not a royalty acquired by the mineral owners and they were not required under the clear terms of the 1982 settlement agreement to pay a proportionate share of it to the royalty owners. Because these facts were undisputed, we hold summary judgment was proper on the breach of contract claim.

## 2. The Applicable Standard For Measuring the Duty Owed by Mr. Flocchini

 The royalty owners contend the district court applied the wrong standard for measuring the duty owed to them by Mr. Flocchini as a successor to the executive right under the original agreement between Mr. Wright and Ms. Spielman. They claim the court erred in relying on *True Oil Co. v. Sinclair Oil Corporation*, 771 P.2d 781, 793 (Wyo.1989) to conclude that the fiduciary duty was defined by the 1982 agreement and was limited to acting in good faith and as a prudent mineral operator. They argue the district court's reliance on *True Oil* was misplaced because in that case True's relationship with Sinclair as agent and trustee arose from the contract itself, warranting the conclusion that the contract alone defined the obligations between the parties. In contrast, the royalty owners argue, the relationship between themselves and Mr. Flocchini arose not from the 1982 settlement agreement, but from Mr. Flocchini's position as executor of the royalty owners' interest. Thus, the royalty owners assert, the district court erred in concluding that the 1982 settlement agreement defined the relationship between the parties. The mineral owners respond that the parties' agreement controls the relationship and, therefore, Mr. Flocchini's duty as holder of the executive rights was to act in good faith and as an ordinary prudent mineral owner.

 In its summary judgment decision letter, the district court stated:

The 1982 Agreement and Assignment expressly provided for and defined the duty of the Defendant as to executory authority and good faith. When parties express a standard of care, the existence

and extent of their duties is controlled by that contractual expression. *See, True Oil Co. v. Sinclair Oil Corp.*, 771 P.2d 781 (Wyo.1989). In this case [royalty owners] have attempted to separate good faith and fair dealing out of an argued fiduciary duty. As these are intertwined, and because of questions of fact relating to the question of good faith and fair dealing, Counts 2 [breach of covenant of good faith and fair dealing] and 3 [breach of fiduciary duty] present issues proper for hearing. The existence of duty is a question of law for the court to decide and, finding that a duty is present, Counts 2 and 3 should proceed.

We hold that the district court correctly concluded the 1982 settlement agreement defined the standard of care Mr. Flocchini owed to the royalty owners.

 We have recognized in a number of cases that contracting parties may incorporate express terms varying the standards that would otherwise govern their relationship. *Kemper Architects, P.C. v. McFall, Konkel & Kimball Consulting Engineers, Inc.*, 843 P.2d 1178, 1185 (Wyo.1992). Where express terms are contractually agreed upon, they control the relationship of the parties. *Id.* Consistent with this general principle, we concluded in *True Oil Co.*, 771 P.2d at 793, that the rights and duties of the parties were controlled by their agreement. We cited *Tenneco Oil Co. v. Bogert*, 630 F.Supp. 961, 967 (W.D.Okla.1986) for the principle, applicable in joint ventures to develop oil and gas properties, that the existence and extent of fiduciary duties is controlled by the terms of the agreement between the parties. *True Oil Co.*, 771 P.2d at 793. Although *Tenneco Oil Co.* involved a joint operating agreement, the principle we cited from the case is equally applicable to the agreement at issue here in which the parties expressly agreed that mineral owners would "negotiate all future oil and gas leases and other mineral leases in good faith and as ordinary prudent mineral owners." That was the standard the parties agreed to and that was the standard that governed Mr. Flocchini's conduct.[5] Consis-

---

5. It is noteworthy that 2 Williams & Meyers, *Oil and Gas Law*, § 339.3, p. 222.2(1) (Revised 2002)

describes the prudent landowner test as "the best compromise between the minimum standard of

tent with our longstanding principles of contract interpretation, we will not rewrite the parties' express and unambiguous agreement.

### 3. *Evidence that Mr. Flocchini Violated the Good Faith, Prudent Mineral Owner Standard*

 Royalty owners argue next that even if the 1982 settlement agreement established the duty owed by Mr. Flocchini as that of a good faith, prudent mineral owner, the evidence presented at trial showed that he violated the duty. Essentially, royalty owners contend the undisputed evidence showed that Mr. Flocchini was guilty of self-dealing in negotiating the lease terms with Petrox. Mineral owners respond that the facts as found by the district court clearly demonstrate that Mr. Flocchini acted in good faith and as an ordinary prudent mineral owner in negotiating the lease with Petrox.

 The district court made the following findings of fact relevant to the issue of Mr. Flocchini's conduct:

20. After Petrox had completed its negotiations with [Mr.] Flocchini, it proceeded to negotiate leases with other mineral owners in the area of the proposed development. Because of their collective 50% mineral interest, the Wright family had greater negotiating strength than any other mineral owner. The Wright family was therefore able to negotiate a 16% lease with Petrox. All other mineral owners that executed leases in favor of Petrox agreed to leases with landowners royalties equal to, or less than, the landowners royalty negotiated by [Mr.] Flocchini.

21. Two of the mineral owners that negotiated leases in favor of Petrox with respect to minerals underlying the Durham Ranch ... are Plaintiffs in this action, and several others were professionals who purchased and sold minerals as a regular course of their business. Each of these leased their mineral interests to Petrox with landowners royalties that were equal to, or less than, the landowners royalty negotiated by [Mr.] Flocchini.

22. What a lessee would be willing to offer, and what a lessor would be willing to accept, in terms of a reserved landowners royalty in a mineral lease can vary depending upon such factors as the time of the lease, the location of the minerals, the type of mineral that the lessee intends to produce, the existence or absence of lease depth restrictions, the speculative nature of the proposed development, and other economic conditions at the time.

23. The amount of the landowners royalty reserved in oil leases, conventional gas leases, leases in other locations, and leases executed at other times not illustrative of the amount that an ordinary prudent mineral owner would have accepted in negotiating a lease of the type, in the location, and at the time of the Flocchini/Petrox lease.

24. The leases [Mr.] Flocchini negotiated and executed in this case were reasonable and fair to all those mineral owners and nonparticipating royalty owners that were entitled to share in the proceeds thereof. Further, the leases contain terms which an ordinary prudent mineral owner would have negotiated.

25. The effect of the methane production activity on the Durham Ranch has been profound: Fences have been broken, gates have been left open, livestock has been injured and lost, the land has been disturbed, there has been flooding during the winter, gates have frozen shut, and increased roads, traffic, dust, and debris have seriously altered the aesthetics of the ranch.

26. Given the impact of the methane production activities on Durham Ranch, and the contingent and speculative nature inherent in accepting an overriding royalty as compensation for surface use, access, and damages, the compensation [Mr.] Flocchini negotiated on behalf of Durham

good faith and the rigorous standard required of a trustee." *See also* pp. 212–13 for a detailed discussion of the prudent landowner test. While citing Williams & Meyers in their brief, royalty owners fail to mention that the standard endorsed by the authors is the very one contained in the 1982 settlement agreement.

Ranches, Inc., in 1994 was fair and reasonable.

The district court also reached the following conclusions of law relevant to this issue:

33. By virtue of the 1982 Settlement Agreement, the Plaintiffs and the Defendant established the standard of care that would govern all negotiations between [Mr.] Flocchini and prospective mineral lessees. [Mr.] Flocchini was, pursuant to that agreement, obligated to negotiate "in good faith and as [an] ordinary prudent mineral owner."

34. In addition to the duties [Mr.] Flocchini owed to the Plaintiffs by virtue of the 1982 Settlement Agreement, he also owed corresponding duties to Durham Ranches, Inc. These mutual and corresponding duties prohibited [Mr.] Flocchini from using the bargaining advantages possessed by the mineral owners to the benefit of the surface owner, and likewise prohibited him from using the bargaining advantages possessed by the surface owner to the benefit of the mineral owners.

35. To the extent that [Mr.] Flocchini had greater bargaining power during his negotiations with Petrox than did other minority mineral owners, that greater bargaining power was derived from his ability to convey access to the surface estate. [Mr.] Flocchini owed the plaintiffs no duty to exercise that greater bargaining power for their benefit. Moreover, had [Mr.] Flocchini used his greater bargaining power to obtain a higher landowners royalty for the mineral owners than the mineral owners could have obtained for themselves, [Mr.] Flocchini would have breached his duty to Durham Ranches, Inc.

36. Throughout his negotiation, execution, and implementation of the leases at issue in the present action, [Mr.] Flocchini: (a) acted in good faith; (b) acted as an ordinary prudent mineral owner; and (c) fulfilled all duties he owed to the Plaintiffs, including those duties both expressed and implied in the 1982 Settlement Agreement.

37. [Mr.] Flocchini did not divert royalties from the mineral owners to the surface estate owner. Rather, he simultaneously negotiated separate agreements for both the mineral owners and the surface estate owner which were unbiased and fair to each.

 After examining all of the properly admissible evidence in the record, we are unable to conclude the district court's findings of fact were clearly erroneous. Giving due regard to the trial court's opportunity to assess the credibility of the witnesses, assuming Mr. Flocchini's evidence is true and giving to him every fair and reasonable inference and keeping in mind that we do not substitute ourselves for the trial court as finder of fact, we are compelled to affirm.

 In reaching this conclusion, we are cognizant of the fact that Petrox's initial offer included a higher royalty payment—16 or 16–2/3% as opposed to the 15% ultimately paid. Had Mr. Flocchini accepted this initial offer, royalty owners' proportionate share would have been greater. However, after hearing the testimony and weighing all of the evidence the district court was persuaded that Mr. Flocchini fulfilled his duty to negotiate in good faith and as an ordinary prudent mineral owner. That we might have reached a different result based upon our review of a cold record is not sufficient grounds to warrant reversal.

### 4. Damages

 In its findings of fact and conclusions of law, the district court included the measure of damages in the event its findings on liability were in error. Royalty owners assert that the district court's use of the wrong legal standard to measure Mr. Flocchini's conduct led to the erroneous conclusion that the percentage interest in the override to which they were entitled should be reduced to their proportionate interest share in the underlying minerals. Having affirmed the district court's findings on liability, any discussion by this Court of the proper measure of damages would be purely advisory. We, therefore, decline to address the proper measure of damages.

### 5. Intentional Interference With a Contract

 In their last issue, royalty owners claim the district court erred in granting

summary judgment on their interference with a contract claim because genuine issues of material fact existed showing "certain mineral owners" intentionally interfered with the cross conveyance and 1982 settlement agreement by entering into the agreement with Durham Ranches that diverted royalties owed to them. This claim by royalty owners is simply another way of stating the other claims alleged, claims upon which we have concluded the district court properly found against royalty owners on summary judgment and after a full opportunity to present evidence over the course of the three and one-half day trial. We find nothing in the record supporting the claim.

Affirmed.